Betty Lou Schluraff, a Minor, by Verne Schluraff, her
Father and Next Friend, Appellee, v. Shore Line
Motor Coach Company and Yellow Cab Company,
Appellants.

Gen. No. 36,234.

570

Opinion filed March 6, 1933.

Cooke, Sullivan & Ricks, for appellant Shore Line Motor Coach Co.; George A. Cooke and Oliver R. Barrett, of counsel.

John E. Kehoe and Samuels, Costello & Greenberg, for appellant Yellow Cab Co.

H. H. Patterson, for appellee; Edmund C. Maurer, of counsel.

Mr. Presiding Justice McSurely delivered the opinion of the court.

On the afternoon of October 12, 1927, plaintiff was injured through a collision between the cab in which she was a passenger, belonging to the Yellow Cab Company, a corporation, and a coach or bus belonging to the Shore Line Motor Coach Company, a corporation. She brought suit and upon trial had a verdict against both companies for $10,000, on which judgment was entered. Both defendants appeal.

The accident happened at the intersection of Michigan boulevard, which runs north and south in Chicago, and Jackson boulevard, which runs east and west. The cab in which plaintiff was riding was going east on Jackson boulevard and was crossing Michigan when it was struck by a southbound bus belonging to the Shore Line Motor Coach Company. Plaintiff was injured

in the collision. The bus was one of three chartered with drivers at $35 a day by the American Gas Association, which was holding meetings in the Stevens hotel, for the convenience of the visiting delegates and their wives in driving about the city. At the time of the accident the three buses were going south on Michigan, headed by a police officer of the south park commissioners on a motorcycle. At the intersection of Jackson and Michigan is a traffic signal light; when the red light showed it was the signal for traffic to stop, and when the green light showed traffic could proceed. The drivers of the buses had been ordered by the police officers to ignore the red lights and to follow the motorcycle officer. The day before the accident the driver of the bus involved had stopped his bus when the red light was against him, but a police officer had specifically instructed him to proceed, keeping his proper distance from the bus ahead of him,—that the police officers would look after the red lights. There is a safety island in the center of Michigan boulevard at Jackson; the westerly half of Michigan is used for southbound traffic; there were four lanes of traffic on the southbound driveway used by vehicles going south; the fourth lane was next to and directly to the right of the safety island; this lane was generally used by vehicles intending to turn around the island proceeding east; this lane was also used by the south park police for convoys under their direction.

The convoy in question consisted of a motorcycle officer with a siren; following him were the three buses about 50 feet apart, the entire convoy moving south on Michigan at a speed which various witnesses estimated at from 12 to 35 miles an hour, most witnesses estimating it at 20 to 25 miles an hour; the siren was sounded continuously, making a loud noise that could be heard for a block or a block and a half away; as the convoy approached Jackson the red light was

against it but the police officer on the motorcycle proceeded south across Jackson, followed by the buses; all the other southbound traffic on Michigan was at a standstill. At this time the eastbound traffic on Jackson consisted of the Yellow cab in which plaintiff was riding and a number of other automobiles; the drivers of these vehicles testified that they heard the siren and knew it was a warning to keep the street clear; when the green light was flashed toward Jackson boulevard all of the traffic on that street remained still, regarding the warning of the southbound siren, except the Yellow cab which started east just as the second bus in the convoy was entering Jackson. The evidence shows that as soon as the cab started the driver of the bus put on his brakes and came to a stop within about a bus length; the Yellow cab continued east in about the center of Jackson and was struck by the southbound bus on the side just about the time the bus had come to a standstill; the cab was not tipped over and the coach and cab were still in contact in the center of the intersection after the accident.

Defendant Shore Line Motor Coach Company argues that the court should have instructed the jury to find it not guilty, for the reason that the driver of the bus was not at the time the servant of the Shore Line Company but of the American Gas Association and the police officers. The district passenger agent of the Shore Line Company had procured the contract from the American Gas Association to furnish three motor coaches or buses, with drivers, for a service of three days. The drivers of the buses were told by the passenger agent to report to the Stevens hotel and wait there for orders from the Gas Association; the coach dispatcher of the Shore Line Company gave the drivers directions to follow the motorcycle escort. This service was rendered to the Gas Association on October 11; at the end of the day's work the buses

returned to the garage of the Shore Line Company; the next morning the drivers with their buses again reported at the Stevens hotel and conveyed a party made up of the wives of the delegates of the Gas Association to the Drake hotel and waited there in order to take the women back to the Stevens hotel; in the afternoon they started on their return trip to the Stevens hotel, a motorcycle officer leading and another police officer in the first bus, directly behind the driver. The officer who led the convoy testified that he received no instructions as to speed; that he determined the rate of speed and the buses were directed to follow him; that he went through all the red lights. The officer who was riding in the first bus testified that he had charge of the speed and was in control of the traffic and that there was a siren assigned to the convoy and that the bus drivers obeyed his orders and followed through the red lights; that his instructions to all the drivers were "to keep close together and bunch up and follow their leader, regardless." All the bus drivers were paid by the Shore Line Company.

These facts are very similar to those involved in *Densby v. Bartlett,* 316 Ill. 616. In that case Bartlett had a contract with Saracino who was in the business of letting automobiles with drivers, for hire, whereby he was to furnish Bartlett transportation of Bartlett's customers; one of these, while riding in one of Saracino's automobiles, was injured in an accident; a verdict was rendered against both Bartlett and Saracino. The Supreme Court held that Bartlett was not liable, on the ground that the driver of the car was not the servant of Bartlett but was the servant of Saracino. After citing and discussing many cases the court rested its conclusion upon the fact that Bartlett did not have the power to discharge the drivers; that this power was in Saracino who hired them. The court

held, in substance, that the right of Bartlett to direct the driver when and where to go, whom to haul and the route to travel, did not place the driver under his control as to the manner of driving the car; that in that regard the driver is doing the work of the general employer and was not subject to the control of Bartlett.

In *Warput v. Reading Coal Co.*, 250 Ill. App. 450, the defendant loaned two trucks to the sisters of a church for carrying school children to a picnic; on the way back one of the children riding on the back of one of the trucks was injured through the negligence of its driver, who was defendant's employee. The court held that the right of the sisters to tell the driver when and where to go and whom to haul was implied, and that this was the only right they exercised; that the employer of the driver had complete control over him, including the right to discharge him. In *Meyer v. Industrial Commission*, 347 Ill. 172, it was said: "This court has held that an unfailing test in determining the relation of master and servant is whether the control of the servant includes the power to discharge him, and unless that power exists the relation of master and servant does not exist," citing cases. *Shannon v. Nightingale*, 321 Ill. 168, involved the question of whether the negligent driver of a truck was at the time the servant of the defendants. Upon trial a motion was made for a directed verdict in their favor, which was denied, and this was assigned as error. It was held that this was proper, as the question should be passed upon by the jury.

Applying these cases to the facts before us, it is quite clear that the Gas Association had no control over the driver of the bus, except to direct him where and when to go and whom to haul; that the Shore Line Company alone had the right to discharge him, and therefore he was not at any time the servant or em-

ployee of the Gas Association. Neither can it be said that the driver ceased to be the servant of the Shore Line Company because he was acting under the immediate direction and control, with reference to speed and traffic regulations, of the south park police officers. The drivers had been instructed by the Shore Line's coach dispatcher "to follow the motorcycle escort," so that the drivers were following instructions from their superior officer of the Shore Line Company. No case is presented where it has been held that because an automobile driver at the time of an accident is obeying the directions of a police officer, the relation of master and servant between such driver and his employer is thereby suspended or destroyed. While the control of the police officer may bear some relation to the conduct of the driver, whether negligent or otherwise, yet it does not affect the relationship of the driver with his general employer. If the driver is negligent generally, the employer is liable.

While we are of the opinion that the court properly refused to direct a verdict in favor of the Shore Line Company, yet we are also of the opinion that the evidence fails to show that the accident was caused by any negligence on the part of the driver of the Shore Line Company's bus. The driver of the bus in question was following definite instructions both of his employer, the Shore Line Company, and of the police officers; the day before, the driver had stopped on the red light signal but was in effect reprimanded by the police officer for so doing and was instructed to follow along with the other buses behind the motorcycle policeman regardless of the red lights; he was simply following instructions. This does not mean that he could blindly and wilfully run into an intercepting vehicle, but the evidence exonerates the bus driver from such conduct. The evidence shows that the lanes of traffic standing at his right on Michigan boulevard would

prevent the driver of the bus from seeing the traffic in Jackson boulevard until he had gone past them; at this time the Yellow cab had started out from the standing traffic in Jackson; as soon as it started out the driver of the bus put on his brakes, coming quickly to a stop; a passenger directly behind the driver was thrown by the sudden stopping of the bus. We fail to see wherein the driver failed in any respect to exercise due care.

We are of the opinion, however, that the evidence justified the verdict against the Yellow Cab Company. The driver of the cab admitted he heard the siren and saw the motorcycle officer going south with a bus following him after the green light was toward Jackson boulevard traffic; he says he failed to see the second bus until he was in the middle of Michigan; that he went into Michigan about 30 feet before he looked to the north; that he was watching out for cars on the south side of Jackson boulevard which make a left-hand turn from Michigan into Jackson. He testified, "I was watching out for them and also going, looking straight ahead." Witnesses who were in eastbound automobiles on Jackson testified that they heard the siren, knew what it meant, and waited for the southbound convoy to pass. The Yellow cab driver, although he heard the siren, negligently started across Michigan before ascertaining whether the convoy had passed. There was also evidence that the bus was larger than the ordinary vehicles, standing much higher, so that if the driver of the Yellow cab had merely glanced to the north he could have seen the bus following the motorcycle convoy.

As tending to support its defense that its drivers were under the control of the police officers, the Shore Line Company requested the court to give an instruction to the jury to the effect that there was in full force at the time an ordinance of the south park com-

missioners which provided that no person should refuse to obey the directions of any police officer in reference to the management of vehicles in the parks or boulevards, under penalty of a fine. Instruction No. 4 also set out the ordinance and instructed the jury that if the driver obeyed the direction of the police officer they should find the Shore Line Company not guilty of negligence in passing across Jackson boulevard at a time when the red lights were against him. We think the ordinance was admissible. The Shore Line Company was entitled to have the jury know that there was a definite ordinance upon the subject of the regulation of traffic by the south park police officers.

The Shore Line Company's instruction No. 7 was refused. It is open to the criticism that nowhere in the instruction is there any requirement that the driver of the bus must exercise ordinary care; it relieves the driver of all care and caution.

The Shore Line's instruction No. 10 was refused. It does not undertake to direct a verdict but only tells the jury that it is the duty of anyone using the boulevards to obey the directions of the police officers. This instruction might well have been given; however, instructions Nos. 42 and 44 tendered by the Shore Line Company were given, which in substance covered the material elements in refused instruction No. 10. The Yellow Cab Company argues that the giving of these two instructions prejudiced its defense and therefore constituted reversible error. The criticisms against these instructions seem captious. They only repeated in general terms that the drivers of vehicles on boulevards must obey directions of the south park police officers. We cannot hold that the court committed reversible error in giving these instructions. Given instruction No. 45 at the request of the Shore Line Company is open to the criticism that in reciting the elements which should move the jury to find the Shore

Line Company not guilty, the element of ordinary care on the part of the driver of the bus is omitted. Instruction No. 46 was properly given as it contained all the necessary elements which would justify the verdict of not guilty as to the Shore Line Company.

There was no need of so many instructions attempting to say the same thing with different words. Altogether, 48 instructions were tendered, some of them lengthy and most of them given. Plaintiff requested only seven, and these are well known stock instructions. The giving of such a large number of instructions was wholly unnecessary and could only serve to confuse the jury. The character and number of these instructions also serves to lessen our critical faculty toward them. *Asmossen v. Swift & Co.*, 243 Ill. 93; *Daubach v. Drake Hotel Co.*, 243 Ill. App. 298; *Adams v. Smith*, 58 Ill. 417.

Criticism is made of the remarks and argument of counsel for plaintiff, which in many respects is justified. However, the instances complained of will hardly occur upon the second trial.

It is said the court improperly gave an oral instruction to the jury. During the argument by counsel for the Yellow Cab Company an objection was made by plaintiff's counsel, which was sustained; the court thereupon remarked that he might ask the jury to disregard any statements made by counsel which were not supported by the evidence. This was not intended as an instruction to the jury and would not have been so understood. The criticism against its form may have merit. *People v. Ambach*, 247 Ill. 451.

The Shore Line Company requested the trial court to submit an interrogatory to be answered by the jury, as follows:

"If you find the defendant, Shore Line Motor Coach Company, guilty, then you will be required to answer the following interrogatory:

"Interrogatory—Was the driver of the bus of the Shore Line Motor Coach Company, at the time of the accident, hired out by the Shore Line Motor Coach Company to do the business of the American Gas Association?"

This was refused, and we think properly. It was awkwardly constructed. The words "hired out . . . to do the business of the American Gas Association" are ambiguous and not applicable. Furthermore, the question did not relate to an ultimate fact, but merely an evidentiary matter. Such interrogatories are never proper. *Wicks v. Cuneo-Henneberry Co.*, 319 Ill. 344; *Smith v. Sanitary Dist. of Chicago*, 260 Ill. 453; *Nosko v. O'Donnell*, 260 Ill. App. 544.

As there must be another trial, we do not discuss the amount of the damages awarded.

We conclude that the verdict finding the defendant Shore Line Motor Coach Company, a corporation, guilty of the negligence charged, is manifestly against the weight of the evidence, and the judgment as to it demands a reversal. We see no sufficient reason to disagree with the finding that the Yellow Cab Company, a corporation, was guilty of the negligence charged. Following the well known rule that a judgment against several defendants is a unit and cannot be reversed as to one or more and affirmed as to the others, we must reverse the judgment in this case and remand for a new trial. *Livak v. Chicago & Erie R. Co.*, 299 Ill. 218.

*Reversed and remanded.*

Matchett and O'Connor, JJ., concur.